IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CASE NUMBER 4:17-CR-9-MAC-CAN |
| | § | |
| THEODORE WILLIAM TAYLOR, ET AL. | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendants Theodore William Taylor ("Taylor") and Chia Jean Lee's ("Lee") (collectively, "Defendants") Joint Motion to Suppress ("Motion to Suppress") [Dkt. 57].  On September 11, 2018, the undersigned conducted an evidentiary hearing and heard oral argument from both the Government and Defendants on the pending Motion to Suppress. After considering the Motion to Suppress, the Government's Response [Dkt. 65], Defendants' Reply [Dkt. 69], all other relevant filings and evidence, as well as the oral argument presented, the Court recommends that Defendants' Joint Motion to Suppress [Dkt. 57] be **DENIED**.

BACKGROUND

**I.   THE INDICTMENT**

On January 18, 2017, Defendants were indicted for a violation of 21 U.S.C. § 846 (Conspiracy to Distribute, Dispense, and Possess with Intent to Distribute and Dispense Controlled Substances) [Dkt. 1].  The one-count Indictment alleges that "Taylor was a medical doctor who operated [two] medical clinic[s]" and "Lee was Taylor's wife and managed [the medical clinics]." In pertinent part, the Indictment charges that "[f]rom in or about January 2010 and continuing through in or about February 2012, in Collin County, Texas, in the Eastern District of Texas and elsewhere, the Defendants herein, Taylor and Lee, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree together with each other and with other persons known

and unknown to the grand jury to knowingly, intentionally, and unlawfully distribute, dispense, and possess with the intent to distribute and dispense controlled substances in violation of 21 U.S.C. § 841" [Dkt. 1 at 4]. The Indictment further specifically charges that:

> Taylor, while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, wrote prescriptions for individuals in exchange for money, which prescriptions authorized the individuals to obtain medications containing a detectable amount of the following controlled substances: oxycodone, a Schedule II controlled substance; amphetamine salts, a Schedule II controlled substance; hydrocodone, a Schedule II controlled substance; and promethazine with codeine, a Schedule V controlled substance

and that both Defendants knew the conduct was unlawful and willfully agreed to further it [Dkt. 1 at 4-5].

## II.  MOTION TO SUPPRESS

At issue herein are two warrants: (1) the House Search Warrant executed on February 2, 2012, which authorized the search of Defendants' Plano home; and (2) the Safety Deposit Box Search Warrant, executed on February 9, 2012, which authorized the search of Defendants' safety deposit box(es) located at United Central Bank.[1]  On August 27, 2018, Defendants filed the instant Motion to Suppress, seeking suppression of "the items seized from the Taylor home, the statements of Chia Jean Lee, and the items seized from the safety deposit box" [Dkt. 57 at 15].[2]  Defendants' Motion to Suppress argues both that probable cause does not exist and that the good faith exception cannot apply to the seizure of any items from Defendants' home.  Defendants' arguments are

---

[1] A third search warrant was issued in this case seeking authorization to search Defendants' clinic in Richardson, Texas ("Clinic Search Warrant").  At Hearing, the Parties confirmed that the Clinic Search Warrant was not the subject of the suppression motion, as discussed more fully infra [Dkt. 70 at 6].

[2] At Hearing, the Government confirmed on the record that no items were seized as a result of the Safety Deposit Box Search Warrant [Dkt. 70 at 14].  As a result, Defendants clarified that they sought to suppress the existence of the warrant and the fact of the search itself [Dkt. 70 at 14].  Defendants further argued at Hearing, for the first time, that they were also seeking to suppress any statements made by Defendant Taylor at Defendants' home [Dkt. 70 at 16]. Neither side identified any such statements made by Defendant Taylor; indeed, the Government advised that they were unaware of the existence of any statements made by Defendant Taylor at the home [Dkt. 70 at 18]. Accordingly, because no statements have been identified to the Court, the Court does not further address the potential suppression of any statements by Defendant Taylor.

REPORT AND RECOMMENDATION – Page 2

premised on their assertion that "the House Affidavit was a bare bones affidavit" that: (1) fails to establish a sufficient nexus between Defendant Taylor's medical clinics and the Defendants' home; (2) is based upon innocent behavior and/or stale information; and (3) is wholly conclusory [Dkt. 57 at 8-11]. Given the "bare bones affidavit," Defendants advance that under the "fruit-of-the-poisonous-tree" doctrine, all evidence subsequently obtained must also be suppressed—including specifically the statements made by Defendant Lee during the search of the residence and the safety deposit box search [Dkt. 57 at 12-14].[3]

The Government filed its Response in Opposition to Defendants' Joint Motion to Suppress ("Response") on September 7, 2018 [Dkt. 65]. Defendants' Reply and Joint Motion to Strike the Declaration of Susannah Herkert were originally filed on September 10, 2018 as a single document [Dkt. 66]. On September 12, 2018, Defendants re-filed their Reply [Dkt. 69] and Motion to Strike [Dkt. 68] as separate documents. The substance of the filings was unchanged.

The Court conducted an evidentiary hearing on September 11, 2018 [Dkt. 67]. At Hearing, the Government called DEA Diversion Investigator Susannah Herkert ("DI Herkert"). Other than those exhibits attached to the Parties' briefing, no additional exhibits were proffered or admitted at Hearing. The Hearing transcript was filed on September 14, 2018 [Dkt. 70]. The underlying facts relevant to Defendants' Motion to Suppress are summarized as set forth below.

### III. THE CLINIC AND HOUSE SEARCH WARRANTS

Both the Clinic Search Warrant, which authorized the search of Defendant Taylor's medical clinic in Richardson, Texas (the "Clinic"), and the House Search Warrant, which

---

[3] Defendants also summarily assert that "the Government cannot overcome the exclusion of the interview and safety deposit box search/seizure under the independent source exception; the inevitable discovery exception; or the attenuated basis exception" [Dkt. 57 at 14]. At Hearing, the Government confirmed that it was not asserting any of these exceptions to the fruit of the poisonous tree argument [Dkt. 70 at 17].

authorized the search of Defendants' home, are supported by an affidavit, prepared by DI Herkert, with the assistance of the US Attorneys' Office and other involved law enforcement officers [Dkt. 70 at 34].[4] While Defendants were ultimately indicted only for alleged violations of 21 U.S.C. § 846, the Clinic and House Search Warrants also sought to obtain evidence of any alleged violations of 18 U.S.C. §§ 1956 and 1957 (money laundering) [Dkt. 58-1 at 5].

At Hearing, Assistant United States Attorney Stevan A. Buys confirmed that he and others had reviewed the affidavit with DI Herkert prior to presenting the warrants [Dkt. 70 at 72]. The Clinic Search Warrant was presented to Magistrate Judge Paul D. Stickney of the Northern District of Texas, [Dkt. 65-3 at 1], and the House Search Warrant was presented to Magistrate Judge Don D. Bush of the Eastern District of Texas, [Dkt. 65-4 at 1].

The House Affidavit generally describes DI Herkert's credentials and outlines the background investigation of Defendants' alleged criminal activity in the Eastern and Northern Districts of Texas [Dkts. 58; 65-2]. DI Herkert specifically attests that:

> [b]ased on information provided by Taylor's "patients," a review of Taylor's prescribing history, an undercover investigation, a medical expert's review of Taylor's prescribing history and practices, and other information detailed herein, there is probable cause to believe that Taylor is distributing and dispensing controlled substances outside the usual course of professional practice and without a legitimate medical purpose at [the Clinic] in violation of 21 U.S.C. §§ 841(a)(1) & 846, and that he is laundering the proceeds obtained by his illicit drug sales…While Taylor's illicit drug distribution appears to be occurring primarily at the [] Clinic, there is probable cause to believe he is using [his home] to facilitate that crime and, more specifically, to facilitate the laundering of drug proceeds related thereto

[Dkts. 58-1 at 11; 65-2 at 3]. DI Herkert then summarizes Defendant Taylor's registration and license records, the law regarding prescription medication, and the particular types of drugs in question in this case [Dkts. 58-1 at 11-17; 65-2 at 3-8].

---

[4] The Government confirmed at Hearing that the affidavits were identical, save and except for the description of the place to be searched [Dkt. 70 at 7].

REPORT AND RECOMMENDATION – Page 4

DI Herkert continues on to outline the investigation regarding Defendant Taylor, a licensed medical doctor, and his wife, Defendant Lee, who managed the Clinic. According to the affidavit, DI Herkert's investigation began when a local pharmacy contacted the DEA regarding a concern over the dispensation of approximately 11,000 hydrocodone and Xanax pills to Defendant Taylor's patients [Dkts. 58-1 at 17; 65-2 at 9]. As a result, DI Herkert and Special Agent Chris Woolbright ("SA Woolbright") reviewed a print-out for 715 controlled substance prescriptions filled for Defendant Taylor's patients over a three-month time period [Dkts. 58-1 at 17; 65-2 at 9]. In addition, DI Herkert was informed by the Texas Medical Board ("TMB") about complaints against Defendant Taylor's practice [Dkts. 58-1 at 17-18; 65-2 at 9-10]. DI Herkert subsequently reviewed the Texas Department of Public Safety's physician prescribing history records for Defendant Taylor for the 11-month period between May 2010 and April 2011, [Dkts. 58-1 at 23; 65-2 at 15]. The prescribing history and prescription records were also reviewed by a Medical Expert, Dr. Graves Owen [Dkts. 58-1 at 33; 65-2 at 24]. DI Herkert summarized Dr. Owen's report, which concluded that "Dr. Taylor provided…prescriptions that are outside the scope of a professional medical practice and are not for a legitimate medical purpose" at his medical clinics [Dkts. 58-1 at 33; 65-2 at 24].

During the course of DI Herkert's investigation, several individuals receiving controlled substances from Defendant Taylor were identified and interviewed, including Willie Louise Dunn and Drew Chapman [Dkts. 58-1 at 18-23; 65-2 at 9-12]. Both Dunn and Chapman reported that Defendant Taylor never conducted a medical examination, but nonetheless wrote prescriptions for drugs, including hydrocodone, Xanax, and promethazine with codeine [Dkts. 58-1 at 18-23; 65-2 at 9-12]. Subsequently, DEA investigators and DeSoto Police Department officers visited Defendant Taylor's medical clinics in an undercover capacity to attempt undercover buys of

prescription medications. DI Herkert attested to the details and results of seven (7) undercover buys for prescription medications conducted by the DEA and DeSoto Police Department at Defendants' clinics between September 2011 and January 2012, which corroborated the information from Dunn and Chapman [Dkts. 58-1 at 26-32; 65-2 at 17-18].[5]

In the final section of the House Affidavit, DI Herkert detailed "evidence of financial transactions involving drug proceeds" wherein she described: (1) her past practices and experience in executing search warrants at doctors' residences and their clinics/offices, "which ha[d] repeatedly resulted in the seizure of significant contraband;" (2) the Department of Motor Vehicle Image Record identifying Defendants' home as 700 January Drive, Plano, Texas; and (3) the surveillance conducted on both Defendants [Dkts. 58-1 at 35-37; 65-2 at 27-29].

DI Herkert's investigation revealed that Defendant Taylor operated a cash-only clinic, and that Defendant Taylor's wife, Defendant Lee, worked at the Clinic handling the cash proceeds and making bank deposits. Surveillance established that Defendants would travel from the Clinic to their home, and upon arrival at the home would take items from the Clinic into the house—Defendants were specifically observed carrying into the home a briefcase, a manila envelope, and bags containing unknown items [Dkts. 58-1 at 37; 65-2 at 29]. At Hearing, DI Herkert clarified that during the instances of surveillance, on all but one occasion, Defendants traveled directly from the Clinic to the home [Dkt. 70 at 57]. Defendants were never observed to stop and make any bank deposits on these occasions and/or to make any purchases from any other locations [Dkts. 58-1 at 37; 65-2 at 29; 70 at 57].

---

[5] A total of seven undercover buys were conducted in furtherance of the investigation between September 2011 and January 2012, in which undercover DEA investigators and DeSoto Police Officers all received prescriptions for hydrocodone, alprazolam, and/or phentermine [Dkts. 58-1 at 26; 65-2 at 18]. For three of the seven undercover buys, DI Herkert included specific details—providing portions of conversations—of the agents' examinations by Defendant Taylor [Dkts. 58-1 at 26-32; 65-2 at 18-23].

On January 9 and 17, 2012, law enforcement conducted "trash runs" at Defendants' home; evidence of four financial transactions at three banks—Southwestern National Bank, Compass Bank, and JP Morgan Chase Bank— involving Defendants' medical practice were found in trash receptacles recovered from the curb in front of Defendants' home [Dkts. 58-1 at 38; 65-2 at 30]. Importantly, a bank statement from JP Morgan Chase and a line-of-credit statement from Compass Bank were addressed to the Clinic in name, but the mailing address was listed as Defendants' home [Dkts. 58-1 at 38; 65-2 at 30].

On January 19, 2012, the Richardson Police Department conducted a traffic stop of Defendant Lee where it was further confirmed that Defendant Lee worked at the Clinic and was "responsible for making bank deposits for the clinic" [Dkts. 58-1 at 37; 65-2 at 29].  DI Herkert lastly described five Currency Transaction Reports ("CTRs") filed by financial institutions showing large sums of cash deposited by Defendant Lee and linking the deposits to Defendants' medical practice [Dkts. 58-1 at 39-40; 65-2 at 31-32].  Of the five CTRs, four were filed by Southwestern National Bank and one was filed by Golden Bank.  The CTRs all identified Defendant Lee as the person conducting the transaction.  Three of the CTRs identified Defendant Lee's occupation as "Assistant of Family Clinic," "Clinic Secretary," or "Office Manager."  Three of the CTRs indicated that the transactions were made on behalf of "Taylor Texas Medicine"— the Defendants' Clinic.  Additionally, one CTR listed Defendant Lee "as a person on whose behalf the transaction was conducted" and indicated her address as that of Defendants' home [Dkts. 58-1 at 38-39; 65-2 at 31-32].

Magistrate Judge Don D. Bush of the Eastern District of Texas issued the House Search Warrant on February 1, 2012 at 3:04 P.M. [Dkt. 65-4 at 1]. The warrant was executed on February 2, 2012 at 11:00 A.M. [Dkt. 65-4 at 2].[6] A return was provided indicating as follows: Inventory of Property Seized Pursuant to the Warrant: (1) U.S. Currency; (2) iPad; (3) Apple/Macintosh Computer; (4) Dell Laptop; (5) HP Laptop; (6) Three (3) Dell computers; (7) External hard drive; (8) Financial Documents; (9) Receipt books; and (10) keys [Dkt. 65-4 at 3]. Defendants seek suppression of each of these items.

### IV.  THE SAFETY DEPOSIT BOX SEARCH WARRANT

On February 9, 2012, SA Woolbright prepared an application and affidavit in support of a search warrant for Defendants' Safety Deposit Box [Dkt. 58-1 at 46]. The Safety Deposit Box Affidavit incorporates by reference the House Affidavit, describes the execution of the Clinic and House Search Warrants, and further details the interview conducted by SA Woolbright of Defendant Lee [Dkt. 58-1 at 48-50]. SA Woolbright specifically attested that Defendant Lee provided the following information in her interview: "[t]he Target Safety Deposit Box contains cash, gold bars, gold coins, and jewelry, at least some of which constitutes proceeds from Taylor's clinic or were acquired with such proceeds" [Dkt. 58-1 at 50]. The Safety Deposit Box Affidavit then goes on to describe the interviews of Defendant Taylor and assistant office manager, Leandra Petit, conducted at the Clinic during the execution of the Clinic Search Warrant [Dkt. 58-1 at 50-51].

---

[6] As noted earlier, the House Search Warrant was executed simultaneously with the Clinic Search Warrant. Because the Clinic was located in Richardson, Texas, the Clinic Search Warrant was presented to and signed by Magistrate Judge Paul D. Stickney of the Northern District of Texas [Dkt. 65-3 at 1].

Magistrate Judge Don D. Bush of the Eastern District of Texas issued the Safety Deposit Box Search Warrant on February 9, 2012 and it was executed the same day [Dkt. 58-1 at 46]. No items were seized in executing the warrant; the Safety Deposit Box was empty upon search.

## ANALYSIS

To reiterate, Defendants move to suppress any and all items seized from Defendants' home, the statements of Defendant Lee, and the existence or fact of the search of the safety deposit box [Dkt. 69 at 6-7]. At Hearing, the Court confirmed that Defendants sought suppression on the following bases: (1) the House Search Warrant lacks probable cause; (2) the good faith exception does not apply as the House Search Warrant is so lacking in indicia of probable cause as to render belief on its existence unreasonable; and (3) Defendant Lee's statements and the existence of the search/warrant for the Safety Deposit Box should be suppressed under the fruit of the poisonous tree doctrine [Dkt. 70 at 9, 12, 16-17].[7] As to Defendants' argument regarding the lack of indicia of probable cause and/or "bare bones affidavit," Defendants specifically assert that the House Affidavit is: (1) wholly conclusory; (2) fails to establish sufficient nexus between the Clinic and Defendants' home; and (3) is based upon innocent behavior and/or stale information [Dkt. 57 at 8-11].[8]

**I.    THE FOURTH AMENDMENT FRAMEWORK AND THE SUPPRESSION REMEDY**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The exclusionary rule, which permits criminal defendants to seek exclusion (suppression) of

---

[7] Defendants in their Joint Motion to Strike [Dkt. 68], and at Hearing, also contend that the Declaration of DI Herkert attached as exhibit one to the Government's Response [Dkt. 65] should be stricken [Dkts. 69; 70 at 65-67]. The Court did not rely on the Declaration of DI Herkert [Dkt. 65-1] in its analysis, and as such, for purposes of the instant Motion to Suppress, the Court assumes, without deciding, that the declaration is not properly before the Court [Dkt. 68].
[8] Defendants also argued that the House Affidavit was invalid for lack of probable cause in addition to arguing that the good faith exception did not apply because of the bare bones affidavit [Dkt. 70 at 8].

evidence obtained through "illegal search and seizure[,]" provides one vehicle through which citizens may "effectuate [this] Fourth Amendment right." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (noting that this rule "applies as well to the fruits of the illegally seized evidence"). The U.S. Supreme Court has characterized exclusion through suppression for decades as an "extreme sanction" that courts should apply only sparingly. *United States v. Leon*, 468 U.S. 897, 926 (1984); *see also Herring v. United States*, 555 U.S. 135, 141 (2009) (warning that application of the exclusionary rule exacts "substantial social costs") (citations and internal quotations omitted); *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence, however, has always been our last resort, not our first impulse."). Further, "[a] defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

A court must engage in a two-part inquiry in deciding whether to suppress evidence: it generally must ask first whether the good faith exception applies (and, in turn, whether any of the exceptions to that rule applies) and then, whether probable cause supports the warrant in question. *Leon*, 468 U.S. at 924. Indeed, courts generally consider whether probable cause supports the warrant only in the absence of good faith. *See United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009); *United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988) ("Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the probable cause issue if . . . the good-faith exception of *Leon* will resolve the matter.").

"Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith." *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003) (citing *Leon*, 468 U.S. 897). Normally, the issuance of a warrant by a

magistrate suffices to establish an officer's good faith. *United States v. Pena-Rodriquez*, 110 F.3d 1120, 1130 (5th Cir. 1997). But good faith cannot be established if one of the following four circumstances is present:

> (1) [i]f the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

*Payne*, 341 F.3d at 399–400 (quoting *United States v. Webster*, 960 F.2d 1301, 1307 n. 4 (5th Cir. 1992)) (hereinafter referred to as the "*Leon* exceptions"). In considering whether the good faith exception applies, the Court does not attempt to determine the officers' subjective belief regarding the validity of the warrant. *See Leon*, 468 U.S. at 922 n. 23. Relevant herein, where a warrant is supported by more than a bare bones affidavit, an officer may rely in good faith on the warrant's validity. *United States v. Hall*, No. 1:13-CR-112(1), 2014 WL 12646032, at *3 (E.D. Tex. May 1, 2014), *report and recommendation adopted,* No. 1:13-CR-112(1), 2014 WL 12647763 (E.D. Tex. June 3, 2014), *aff'd,* 654 F. App'x 653 (5th Cir. 2016). Because this case does not present a novel question of law, the Court first addresses the good faith exception.

## II.   THE GOOD FAITH EXCEPTION

### *BARE BONES AFFIDAVIT/NO INDICIA OF PROBABLE CAUSE*

Defendants contend that the House Affidavit is so facially deficient that the good faith exception cannot apply because the House Affidavit is a bare bones affidavit that "wholly fail[s] to provide any corroboration about the underlying circumstances to show that probable cause exists" and is "full of unreliable, conclusory, and irrelevant statements" [Dkt. 69 at 4].

"A 'bare bones' affidavit is defined as one that contains 'wholly conclusory statements, [lacking] the facts and circumstances from which a magistrate can independently determine probable cause.'" *Hall*, 2014 WL 12646032, at *3 (citing *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992)); *see also United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006) ("[E]xamples of 'bare bones' affidavits include those that merely state that the affiant 'has cause to suspect and does believe' or '[has] received reliable information from a credible person and [does] believe' that contraband is located on the premises.") (alterations in original) (citations omitted). "Whether an affidavit is 'bare bones' is determined under 'the totality of the circumstances, including the veracity, reliability, and basis of knowledge of a confidential informant.'" *Id.* (quoting *United States v. Fisher*, 22 F.3d 574, 578 (5th Cir. 1994)). "The issuing judge must be allowed to draw reasonable inferences from the affidavit, and the ultimate determination of the affidavit's adequacy is entitled to great deference on review." *Id.* (quoting *United States v. May*, 819 F.2d 531, 535 (5th Cir. 1987)).

At Hearing, Defendants specifically argued that the allegations in the House Affidavit are conclusory and insufficient to support probable cause, thereby rending the affidavit a bare bones affidavit, in large part, because the House Affidavit: (1) fails to establish a nexus between the crime allegedly committed and the place to be searched (Defendants' home); (2) fails to provide evidence of illegal activity because it only references innocent behavior; and (3) the evidence relied upon to support the House Affidavit and House Search Warrant is stale [Dkts. 69 at 2-4; 70 at 62-65, 67-68].

Contrary to Defendants' assertions, the House Affidavit constitutes more than a "bare bones" affidavit. It goes beyond simply stating DI Herkert's suspicions or general belief(s) in cases of this nature or type. The House Affidavit contains numerous specific facts regarding the

investigation and alleged criminal activity occurring at Defendants' medical practice including interviews of Defendant Taylor's patients, a review of Defendant Taylor's prescribing history by both DI Herkert and a medical expert, a review of the Texas Medical Board complaints against Defendant Taylor's practice, and details of seven undercover buys conducted in relation to the investigation. DI Herkert then goes on to explain:

> [b]ased on training and experience, [she] know[s] that doctors involved in the generation and laundering of illicit drug proceeds typically maintain evidence of their crimes both at their place of work and at their residence. Thus, it has been [her] practice to simultaneously execute search warrants at doctors' residences and their clinics/offices, which has repeatedly resulted in the seizure of significant contraband and evidence of these crimes. [She] [has] been the case agent on multiple cases regarding doctors involved in the unlawful distribution of controlled substances. Numerous items of evidence were found during the execution of search warrants at those doctors' residences, including large quantities of cash, billing records, patient files, and firearms

[Dkt. 58-1 at 36]. But the information linking Defendants' residence to the alleged criminal conduct at the Clinic does not end with DI Herkert's recounting of past experience. To further support DI Herkert's rational for needing to search Defendants' home, DI Herkert then details the following: (1) surveillance conducted on both Defendant Taylor and Defendant Lee where both Defendants were seen taking items from the Clinic, getting into their car, and driving directly back to their home, and bringing those items inside [Dkt. 58-1 at 37];[9] (2) two trash runs which resulted in obtaining at the home financial documents addressed to and directly related to the Clinic [Dkt. 58-1 at 38]; (3) a traffic stop in which it was confirmed that Defendant Lee makes bank deposits on behalf of the Clinic [Dkt. 58-1 at 37]; and (4) CTRs that showed cash deposits of $10,000.00 or more made by Defendant Lee on behalf of the Clinic and referencing the home's address [Dkts. 58-1 at 38; 70 at 29-30].

---

[9] At Hearing, DI Herkert testified that only one of the five surveillances observed Defendants making a stop in between the Clinic and their home, which was to pick up their son [Dkt. 70 at 57].

REPORT AND RECOMMENDATION – Page 13

What is more, DI Herkert was not the only person to review the House Affidavit for probable cause.  Specifically, at Hearing, DI Herkert testified that other agents and AUSA Stevan Buys also reviewed the House Affidavit and found it sufficient [Dkt. 70 at 34].  Moreover, the Clinic Affidavit and House Affidavit are materially identical, the only difference between the two affidavits being the identification of the place to be searched [Dkt. 70 at 7].  Defendants conceded that they are not challenging the validity of the Clinic Affidavit and Clinic Search Warrant [Dkt. 70 at 6-7].  The Clinic Affidavit was submitted to Magistrate Judge Paul D. Stickney in the Northern District of Texas [Dkt. 65-3].  The Court finds it persuasive that two separate magistrate judges found the materially identical Clinic and House Affidavits to be sufficient in issuing their respective warrants.  *See e.g.*, *United States v. Payne*, 341 F.3d 393, 401 (5th Cir. 2003) (finding that a reasonably well-trained officer would be entitled to accept the magistrate's determination that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought" could be located in defendant's home where an agent, investigator, detective, U.S. Attorney, and signing magistrate all agreed that probable cause existed) (quoting *United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir. 1977).

### *NEXUS BETWEEN CRIMINAL CONDUCT AND HOME*

More directly to the issue of nexus, Defendants argued at Hearing that the House Affidavit lacked sufficient indicia of probable cause because the allegations in the affidavit did not establish a sufficient bridge between the alleged criminal activity occurring at the Clinic and Defendants' home [Dkt. 70 at 22, 62-63].  Defendants aver that of the 36-page House Affidavit the only facts related to Defendants' home are found in paragraphs 28 through 33 of the House Affidavit [Dkt. 70 at 10-11, 22].  Defendants posit that these paragraphs are simply not enough.

Other courts have previously found it reasonable to search the home of person who has allegedly committed a crime as long as there are facts which "establish a nexus between the house to be searched and the evidence sought." *United States v. Laury*, 985 F.2d 1293, 1313 (5th Cir. 1993). "A nexus between the place to be searched and the items to be seized may be established through direct observation or through normal inferences." *United States v. Robins*, 978 F.2d 881, 892 (5th Cir. 1992) (citing *United States v. McKinney*, 758 F.2d 1036, 1043 (5th Cir. 1985). "Generalizations in an affidavit regarding the likely location of evidence will not undermine the reasonableness of reliance on the warrant." *Payne*, 341 F.3d at 400. "While the generalization alone might be insufficient to render official reliance reasonable, other facts in the affidavit taken together with generalizations founded upon training and experience could support reasonable reliance." *Id.; United States v. Perez*, Criminal Action No. L-09-2897-8, 2010 WL 11507135, at *3 (S.D. Tex. June 22, 2010) (finding a nexus established where "the affidavit specifies the residence to be searched was Defendant's residence during the time he was allegedly involved in the drug conspiracy and further details that in the agent's experience, drug traffickers often keep such items as those sought to be searched, in their homes."); *United States v. Nguyen*, 172 F. App'x 558, 561-62 (5th Cir. 2006) (finding that an affidavit that detailed observations from surveillance, information from co-defendant, identified defendant as owner of the residence, and included generalizations that "drug dealers often keep contraband in their residence" established a sufficient nexus to search the residence); s*ee also United States v. Duncan*, Criminal No. 07-60050, 2008 WL 1859996, at *3 (W.D. La. Apr. 23, 2008) (citing *United States v. Green*, 634 F.2d 222, 226 (5th Cir. 1981) ("The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is

nevertheless maintained."); *Robins*, 978 F.2d at 892 ("A residence is a quite convenient, commonly-used place for planning continuing criminal activities like large-scale marijuana trafficking and money laundering conspiracies.").

Consider in *Nguyen*, a case in which the defendant pled guilty to possession with intent to distribute methamphetamine, a search warrant of the defendant's residence was executed based on: (1) surveillance of another apartment that defendant visited; (2) an interview with the owner of that apartment where the owner stated defendant sold him methamphetamine; and (3) statements by the affidavit-drafting officer that "drug dealers often keep contraband in their residences." 172 F. App'x at 561.  The search warrant of defendant's residence sought to search for evidence associated with that defendant's distribution of methamphetamine.  *Id.*  The court ultimately held that these facts were sufficient to "establish a nexus between the residence and the illegal activity through normal inferences as to where the articles sought would be located." *Id.*

In the instant case, the House Affidavit contains a more detailed "nexus" than that found sufficient in *Nguyen*.  The House Affidavit attempts to establish a nexus between Defendants' home and the illegal activity both from direct observation (i.e. the results of the investigation) and also "through normal inferences as to where articles sought would be located" in DI Herkert's past experience and training.  The investigation established that Defendants' work and personal lives were intertwined —notably the bank documents obtained from the trash runs reflecting the name of the Clinic but the mailing address for Defendants' home as well as the items Defendants' were observed to take from the Clinic into the home —and therefore, it was reasonable to infer, as two other magistrate judges have already determined, that evidence of the illegal conduct believed to be occurring at the Clinic could be found within the home.

The Court finds that based on the information provided in the House Affidavit—including the described surveillance, undercover buys, trash runs, a traffic stop, prescribing history record review, and interviews—and DI Herkert's statements as to her own experience and training, the House Affidavit established a sufficient nexus to infer that further evidence of Defendants' alleged criminal activity may be located within the Defendants' home.

### *INNOCENT BEHAVIOR*

Defendants also advance that the surveillance, items taken into the home, trash runs, traffic stop, and CTRs do nothing more than show "innocent behavior" of the Defendants. However, "innocent behavior" can still provide a nexus to link allegedly criminal activity to a defendant's residence. *See United States v. Payne*, 341 F.3d 393, 401 (5th Cir. 2003) (informant's statement that defendant had Internet Access at his residence helped support inference that a search of the home might produce evidence of child exploitation); *Illinois v. Gates*, 462 U.S. 213, 245 at n.13 (1983) (indicating that "innocent behavior frequently will provide the basis for a showing of probable cause"). Indeed, such innocent behavior (as that detailed herein) can establish a nexus when there is evidence that there is cross-over between a defendant's personal and work life. *See United States v. Abdallah*, Criminal Action No. H-07-155, 2007 WL 4570189, at *4 (S.D. Tex. Dec. 26, 2007) ("A search of financial records stored in [defendant's] home was justified based on the nature of the alleged crimes and the overlap between [defendant's] personal and business lives."). Based upon the nature of the alleged crimes set forth in the House Affidavit and the established fact that business records of the Clinic were found at Defendants' home, the described "innocent behavior" and conduct supports finding a nexus.

### *STALENESS OF INFORMATION IN HOUSE AFFIDAVIT*

Defendants lastly contend that the House Affidavit is facially deficient because "items found in the trash at the [Defendants'] home *weeks earlier*…[are] too stale to support probable cause weeks and months later" [Dkt. 57 at 9]. Defendants also argued at Hearing that information gleaned from the traffic stop, which occurred after the trash runs, was equally stale [Dkt. 70 at 68]. "Staleness is an issue which must be decided on the peculiar facts of each case, and [] a mechanical count of days is of little assistance in this determination." *United States v. Robins*, 978 F.2d 881, 892 (5th Cir. 1992) (quoting *United States v. Hyde*, 574 F.2d 856, 865 (5th Cir. 1978) (internal quotations omitted).

DI Herkert testified at Hearing that although the last specific date indicated in the affidavit was the January 19, 2012 traffic stop, the investigation was on-going up to and including February 2012 [Dkt. 70 at 55-56]. Less than a month passed between the January 19, 2012 traffic stop and the execution of the House Search Warrant and DI Herkert testified that the investigation was on-going up to and including February 2012 [Dkt. 70 at 56]. Further, fairly long periods of time are allowed to elapse between information gained and execution of a search warrant in cases where the evidence clearly shows—as it did in this case—a longstanding, on-going pattern of criminal activity. *See United States v. Perez*, Criminal Action No. L-09-2897-8, 2010 WL 11507135, at *3 (S.D. Tex. June 22, 2010) (holding information gathered through surveillance dating as far back to 2007 was not stale because "information pertaining to [defendant's] money laundering activity indicate[d] that such activities continued through 2009); *United States v. Laury*, 985 F.2d 1293, 1314 (5th Cir. 1993) (upholding warrant issued two months after bank robbery because suspects likely to retain evidence). Accordingly, the Court finds that the evidence presented in the House Affidavit to support the House Search Warrant was not stale.

For the foregoing reasons, the Court finds that the good faith exception applies and the items seized pursuant to the House Search Warrant should not be suppressed.[10]

### III. FRUIT OF THE POISONOUS TREE

Defendants further argue that under the fruit-of-the-poisonous-tree doctrine, all evidence derived from the exploitation of an illegal search or seizure (the House Search Warrant and Affidavit) must be suppressed [Dkt. 57 at 12-13]. "Evidence derived from an unreasonable search or seizure generally must be suppressed under the 'fruit-of-the-poisonous-tree doctrine.'" *United States v. Walsh*, No. 2:17-CR-023-D, 2017 WL 3702018, at *3 (N.D. Tex. Aug. 28, 2017) (quoting *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015); *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). Because the Court does not find that an unreasonable search or seizure occurred in this case, it is unpersuaded by Defendants' argument that all evidence derived from the House Search Warrant, including the statements made by Defendant Lee, and the Safety Deposit Box Search Warrant should be suppressed.[11]

### CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court recommends Defendants Theodore William Taylor and Chia Jean Lee's Joint Motion to Suppress [Dkt. 57] be **DENIED**.

As the Parties agreed at Hearing on the record, **within two (2) days after entry of the magistrate judge's report**, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge [Dkt. 70 at 75]. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis

---

[10] Because the good faith exception applies, the Court need not address whether the magistrate had a substantial basis for finding probable cause because this case does not present a novel question of law. *See United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999) ("If the good-faith exception applies, we need not reach the question of probable cause.").

[11] Defendants' briefing could also potentially be read to assert that the Safety Deposit Box Search Warrant is unsupported by probable cause. Defendants' did not however advance or otherwise argue this point at Hearing, and as such, the Court does not address herein.

for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 17th day of September, 2018.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE